UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| TRAVIS BARTHEL, | CIV 16-4176 |
|---|---|
| Plaintiff, | |
| v. | |
| COBRA ENTERPRISES OF UTAH, INC., | |
| Defendant. | |

# DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

By:   /s/ Bill Fuller
       Bill Fuller, Esq.
       FULLER & WILLIAMSON, LLP
       7521 S. Louise Ave
       Sioux Falls, S.D. 57108

       Jeffrey M. Malsch, Esq.
       Anthony M. Pisciotti, Esq.
       PISCIOTTI MALSCH
       30 Columbia Turnpike – Suite 105
       Florham Park, N.J. 07932

       *Attorneys for Defendant*
       *Cobra Enterprises of Utah, Inc.*

I. **INTRODUCTION**

On February 29, 2016, Plaintiff Travis Barthel ("Plaintiff") was injured when his Cobra 9mm Derringer-style handgun ("Handgun") discharged. The Handgun is manufactured to closely replicate the Remington model 95 Derringer, a firearm design that has been safely used for over 150 years for self-defense by consumers nationwide. Cobra's target consumers for this product are western reenactment enthusiasts and single action shooting society members and participants, and it can be used for self-defense purposes depending upon the user's particular circumstances. It is manufactured by Cobra Enterprises of Utah, Inc. ("Cobra"), and this design was subjected to drop tests and firing durability tests, both in-house and by independent laboratories. It is a double-barrel, small-sized, "two-shot" handgun that alternately fires from the top and bottom barrels. The main utility of its design is that it is a super compact firearm that is easily concealed. Every Derringer firearm that leaves Cobra's facility is accompanied by a manual that provides instructions and warnings concerning the safety features of the Handgun and how to safely handle and discharge the firearm. The manual states unambiguously, both on its cover and on the pages within, that the hammer must be placed in the half-cocked position with the cross-bolt safety engaged from the loading step until ready to fire. It is undisputed that Plaintiff did not follow this instruction, and had he followed this clear and simple instruction, this incident would not have occurred.

Plaintiff testified that on the date of the incident, he grabbed his coat from a coat hook within his home, used his other hand to grab a garbage bag, and when he placed his coat on a

table near the garage door exit he heard a "loud pop" (i.e., the discharge of the Handgun). Plaintiff recalls previously leaving the loaded Handgun in a holster within his coat pocket with the hammer down (or in the "fully forward" position) and with the cross-bolt safety in the "fire" position. This clearly violated the proper use instructions from Cobra. It was Plaintiff's personal belief that placing the hammer down on a loaded chamber was safer than placing the hammer in the half-cocked position. Although Plaintiff possessed the manual for the Handgun before the incident, he chose not to read it. Furthermore, he testified that he would not have followed its instruction to place the hammer in the half-cocked position with the cross-bolt safety engaged even if he had read the pertinent instructions and warnings.[1] Following the incident, Plaintiff filed suit against Cobra alleging strict liability and negligence claims sounding in product defect, primarily based on the design of the Handgun.

Cobra is entitled to summary judgment as to Plaintiff's strict liability and negligence claims. Defendant will set forth proof in admissible form that the Handgun can be used safely and is not unreasonably dangerous. Plaintiff simply argues that the Handgun could be "safer" but offers no competent evidence to support an argument that a feasible alternative design would have prevented this incident. Further, even if the Court were to determine a question of fact exists regarding Plaintiff's design defect claim, Plaintiff's misuse of the Handgun is the sole cause of the accident as a matter of law. The manufacturing defect claim should be dismissed because Plaintiff's experts have not presented evidence of a manufacturing defect that caused or contributed to the accident. To the extent that Plaintiff claims that Cobra failed to warn about

---

[1] All of the factual assertions in the Introduction section are supported by facts and citations to the record in the accompanying Statement of Undisputed Facts.

any alleged defect, such a claim should be dismissed as Plaintiff's failure to read the Handgun's manual is fatal to such a claim. Lastly, the record is devoid of any evidence of malice, fraud, or ill-intent by Cobra to justify the submission of the issue of punitive damages to the jury. For these reasons, Cobra seeks dismissal of Plaintiffs' Complaint with prejudice and the entry of judgment in its favor.

## II. LEGAL STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007). In considering a summary judgment motion, the trial court is to consider the evidence in a light most favorable to the non-movant and resolve all reasonable doubts against the movant. Diesel Machinery, Inc. v. B.R. Lee Industries, Inc., 418 F.3d 820, 832 (8th Cir. 2005). However, once the movant meets its burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The non-moving party "must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan v. NME Hosps., Inc., 929 F.2d 1404 (9th Cir. 1991). Summary judgment must be granted when the plaintiff fails to make a showing sufficient to establish an element essential to his case. Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552-53 (1986).

## III. LEGAL ARGUMENTS

### A. Plaintiff's Inability to Establish a Design Defect Warrants Dismissal of Plaintiff's Complaint.

In South Dakota, strict liability arises from selling any product in a defective condition that is unreasonably dangerous to the user or consumer. Peterson, 400 N.W.2d at 912. It is the unreasonableness of the condition of the product, not the conduct of the defendant, that creates liability. Id. A plaintiff can prove that a product is defective and unreasonably dangerous by establishing that: (1) the product is not reasonably fit for the ordinary and reasonably foreseeable purposes for which it was sold or manufactured and expected to be used (i.e., the consumer expectation test); or (2) that the product could have been designed to prevent a foreseeable harm without significantly hindering its function or increasing its price (i.e., the risk-utility test). First Premier Bank v. Kolcraft Enters. (In re Boone), 686 N.W.2d 430, 444-45 (2004). The specific elements for a strict liability design defect claim are: (1) the product was in a defective condition; (2) the condition made it unreasonably dangerous; (3) the defect existed at the time it left the control of the defendant; (4) the product was expected to and did reach the Plaintiff without any substantial unforeseeable change in condition; and (5) the defective condition was a legal cause of the injuries. See Engberg v. Ford Motor Corp., 205 N.W.2d 104, 109 (S.D. 1973); Smith v Smith, 287 N.W.2d 155, 158-59 (S.D. 1979); Jahnig, 283 N.W.2d at 560. The Court does not need to examine these elements in detail because Plaintiff's strict liability claims are barred by the undisputed fact that he misused the Handgun.

1.  **Plaintiff's Strict Liability Claims Must Be Dismissed Due to His Misuse of the Handgun.**

In South Dakota, misuse of a product bars recovery under strict liability theories. Herrick v. Monsanto Co., 874 F.2d 594, 598 (8th Cir. 1989) (citing Smith v. Smith, 278 N.W.2d 155, 161 (S.D. 1979); Kappenman v. Action, Inc., 392 N.W.2d 410, 413 (S.D. 1986). Misuse "involve[s] using a product for its intended purpose but in an improper manner." Peterson v. Safway Steel Scaffolds Co., 400 N.W.2d 909, 919 (S.D. 1987). Here, Mr. Barthel was presumably using the Handgun for self-defense, an intended purpose, but failed to follow the manufacturer's use instructions and generally accepted firearm safety guidelines. Moreover, the failure to follow plain and unambiguous instructions is a misuse of a product. See Lindholm v. BMW of N. Am., 862 F.3d 648 (8th Cir. 2017); *accord* Procter & Gamble Manufacturing Co. v. Langley, 422 S.W.2d 773 (Tex. Civ. App 1967) ("We do not believe that the strict liability doctrine means that under circumstances such as we have here a consumer may knowingly violate the plain, unambiguous instructions and ignore the warnings, then hold the makers, distributors and sellers of a product liable in the face of the obvious misuse of the product").

In Lindholm, the decedent was using a jack supplied by his vehicle's manufacturer when the vehicle fell on him and killed him. Lindholm, 862 F.3d at 650. The decedent's parents filed suit against BMW of North America, the vehicle's distributor, and set forth claims for strict liability based on design defect, negligence, negligent design, breach of implied warranties and wrongful death. Ibid. The plaintiff's expert argued that the jack represented a regression in design and opined that the jack was unsafe. Id. at 650-51. BMW's expert opined that the alleged design deficiencies were not deficiencies and that the cause of the accident was the

6

decedent's rocking back and forth of the vehicle to loosen an intractable bolt. Id. at 651. The manual for the jack stated that the jack was "designed for changing tires only" and that one should "[n]ever lie beneath the vehicle or start the engine while the car is supported by the jack - risk of fatal injury!" Id. at 652. The parties disputed whether the decedent misused the jack on the date of incident. Ibid. At summary judgment, the district court held that BMW was not liable because the decedent misused the jack. Ibid.

On appeal, the Lindholms argued that the decedent's use of the jack was not a misuse, or alternatively that such a misuse was reasonably foreseeable. Id. at 651. BMW argued that the decedent's disregard of the warnings in the manual constituted misuse. Id. at 652. The Eighth Circuit agreed with BMW and found that a reasonable jury would have to conclude that the decedent misused the jack by using it in an improper manner, even if the jack was used for its intended purpose. Ibid. In discussing the decedent's failure to heed the safety warnings in the manual, the Court found that the decedent's misuse of the jack was legally unforeseeable:

> We conclude that Alex's misuse of the jack was not foreseeable as a matter of law, given the warnings that accompanied it. Comment j to [the Restatement (Second) of Torts] § 402A addresses this very issue: **"Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."** Though the Supreme Court of South Dakota has not adopted this comment to our knowledge, we agree with the district court that it would likely do so if confronted by a case like this one…**We therefore have no difficulty concluding that the Supreme Court of South Dakota would apply comment j to these circumstances. That comment makes clear that it is unforeseeable that a user would fail to heed safety warnings, and the Lindholms do not argue that the warnings were somehow inadequate. Alex's misuse of the jack was therefore legally unforeseeable.**

Id. at 652 (emphasis added).

Similarly, in Kay v. Cessna Aircraft Co., the decedent was killed when he attempted to take off in a Cessna Skymaster airplane whose rear engine had stopped. Kay, 548 F.2d 1370, 1372 (9th Cir. 1977).[2] The undisputed evidence showed that the Cessna's rear engine stopped as the decedent taxied to the end of the runway after completing his warm-up procedures in the parking lot. Ibid. Prior models of the airplane had a warning light to alert the pilot of rear engine failures, but the light was removed from later models due its unreliability. Ibid. The decedent's widow and surviving children submitted their wrongful death claim on the theory that the defendant's take-off instructions were inadequate, or alternatively that the decedent's failure to follow the instructions was a foreseeable misuse. Id. at 1373. The defendant argued that the

---

[2] South Dakota has relied on California's precedent and public policy in shaping its own jurisprudence concerning product liability claims. See Burley v. Kytec Innovative Sports Equip, Inc., 737 N.W.2d 397, 411 (S.D. 2007) (citing holding in Valentine v. Baxter Healthcare Corp., 68 Cal. App. 4th 1467, 81 Cal. Rpter. 252 (Cal Ct. App. 1999), to support proposition that the failure of a manufacturer to test or inspect a product alone does not cause an injury); Shaffer v. Honeywell, 249 N.W.2d 251, fn. 7 (S.D. 1976) (citing Ault v. International Harvester Co., 13 Cal.3d 113, 117 Cal. Rptr. 812 (1975), for the proposition that "it is not reasonable to assume that manufacturers would forego improvements in a product and subject themselves to mass liability for a defect just because evidence of an improvement is admissible in a pre-improvement liability case."); Zacher v. Budd Co., 396 N.W.2d 122, 134-135 (S.D. 1986) (relying on North Dakota and California state precedent in holding that the trial court's "failure to give a duty to warn instruction broad enough to encompass strict liability constituted reversible error."); Jahnig v. Coisman, 283 N.W.2d 557, 560 (S.D. 1979) (citing Midgley v. S.S. Kresge Co., 55 Cal. App.3rd 67, 127 Cal. Rptr. 217 (1976), in support of the proposition that a product is defective within the doctrine of strict liability if the manufacturer fails to adequately warn of an anticipated danger).

absence of the warning light was not a defect as the manual for the airplane provided take-off procedures that, if followed, would have alerted the pilot to malfunctioning engines. Ibid. The defendant also argued that the decedent's failure to follow the take-off procedures was a misuse of the aircraft that was not reasonably foreseeable to the defendant. Id. at 1372.

At trial, the jury found for the plaintiffs, but the trial court granted defendant's motion for judgment notwithstanding the verdict. Ibid. Plaintiffs' appeal followed. Ibid. The Ninth Circuit Court of Appeals found that neither of plaintiffs' theories of liability were supported by the evidence. Id. at 1373. In discussing whether the decedent's failure to read the Cessna's instructions constituted a misuse of the airplane, the Court stated:

> Both the Skymaster manual and basic principles of aircraft safety dictate that the pilot be alert at that time for potential problems. The evidence does not indicate that one could reasonably find that a pilot would fail to check his instrument panel during that period. It is unreasonable to expect Cessna to have anticipated such misuse. Plaintiff's evidence of other accidents caused by engine failure, of the difficulty of seeing the instrument panel, and of the dangers of aborting the take-off are not relevant to the circumstances of this case. No inference can be drawn from this evidence that a pilot will utterly disregard even the most routine safety checks during a two-minute pre-take-off wait at the end of the runway and during the initial phase of the take-off itself. The only reasonable inference is that Cessna's instructions were adequate to alert the pilot to engine failure before take-off and that Kay's failure to follow the instructions before and during take-off was unforeseeable misuse for which Cessna could not be held liable.

Ibid. Thus, the Court affirmed the trial court's decision and found that decedent's failure to read Cessna's instructions was an unforeseeable misuse of the airplane.

Here, Plaintiff received the Handgun with a manual that provided clear and unambiguous instructions that would have prevented this incident. Neither Plaintiffs nor their experts have offered any evidence that the manual's instructions or warnings were inadequate. Indeed, the

cover of the manual advises that the hammer must be placed in the half-cocked position and the cross-bolt safety must be engaged when the firearm is being loaded or unloaded. See Cobra's Statement of Undisputed Material Facts, ¶ 13; see also Figure 1 below.



**Figure 1. Manual Cover for the Handgun.**

This warning is also found on several pages throughout the Handgun's manual and required that Plaintiff place the hammer in the half-cock position and engage the cross-bolt safety prior to and during the subject incident. See Cobra's Statement of Undisputed Material Facts, ¶ 13. At no point in the manual is a user instructed to disengage the cross-bolt safety except when the user has the firearm on target and is ready to fire. See Ex. G, Cobra Derringer Manual.

Plaintiff testified that he failed to use either of these safety features when the incident occurred. See Cobra's Statement of Undisputed Material Facts, ¶ 29. Plaintiff's failure to read the manual before the incident was not accidental as he testified that he never reads the manuals for his firearms. See id. at ¶ 21. He also testified that he would have ignored the safety instructions in the manual even if he had read them due to his personal beliefs about how the Handgun should work. Id. at ¶ 23. Aside from ignoring instructions concerning its safety mechanisms, Plaintiff failed to follow warnings and general firearm safety protocols by carrying the Handgun in his coat pocket with no indication of which direction the Handgun's barrels were facing. Id. at ¶¶ 12, 13, 27.

As in *Lindholm* and *Kay*, Plaintiff has not argued inadequacy of the Handgun's warnings, and his failure to follow these rudimentary safety instructions was "therefore legally unforeseeable." Lindholm, 862 F.3d at 652. BMW instructed the user not to conduct undercarriage maintenance on the vehicle using the supplied jack, Lindholm ignored that instruction, and BMW was determined to not be at fault for his death as a matter of law. Id. Cobra instructed its users to engage the hammer's half-cock notch and manual safety button at

11

all times until ready to fire, Barthel ignored that instruction, and Cobra should be determined not at fault as a matter of law.

As a general proposition, manufacturers have the right to assume that consumers of their products will read the warnings and instructions included in those products. In this case, the product is universally known to have the capability of causing serious injury or death if not properly used. Cobra has the right to trust that a consumer will read the instructions and warnings provided with its firearms, and ultimately abide by those instructions and warnings. If Mr. Barthel did not agree with these instructions, he should have found a different firearm to carry. As such, Cobra cannot be held responsible when a user intentionally fails to read the instructions and then is injured because he improperly used the product in contravention to those instructions. Plaintiff's strict liability product defect claims should be dismissed based on his misuse of the product.

### 2. Plaintiff's Strict Liability Claims Fail as a Matter of Law Notwithstanding His Misuse of the Handgun.

Even if this Court considers the elements that Plaintiff must establish in full to pursue his strict liability claims, summary judgment is appropriate. Plaintiff alleges that the Handgun's design is defective and that the Handgun itself is unreasonably dangerous because it does not include a passive safety system. See Ex. A, Plaintiff's Complaint; see also Cobra's Statement of Undisputed Material Facts, ¶36. Specifically, Plaintiff claims that the use of a passive safety system, such as a rebounding hammer, would make the Handgun safer and, presumably, would have prevented the subject incident. Id. at ¶38. Plaintiff's design defect claim is unsustainable as the Handgun was not used in a reasonably foreseeable manner or for its ordinary purposes

when the incident occurred. Instead of following basic firearm safety principles and the Handgun manual's instructions, Plaintiff chose to place a loaded firearm into his coat pocket with both safety features disengaged. Id. at ¶¶ 24 and 25. He also used an incompatible holster that allowed contact between the holster and the trigger. Id. at ¶32. Additionally, he carried the coat in his hand without knowing the orientation of the firearm and the direction in which the barrels were facing. Id. at ¶27. These actions are not reasonably foreseeable uses of a firearm given every firearm's known capability to cause injury and/or damage. Moreover, it is undisputed between the parties that the subject incident would not have occurred if Plaintiff had simply either one, of preferably both, of the two safeties that were implemented in the Handgun. Id. at ¶34. This shows that, if used properly, the Handgun was fit for its ordinary and reasonably foreseeable purpose. This also establishes that the inclusion of a third safety feature in the Handgun would be superfluous. Whether or not this third safety would make the Handgun "safer" is immaterial. The fact is the Handgun was not unreasonably dangerous if used in accordance with the instructions. Accordingly, Plaintiff's theory of liability under the consumer expectation theory fails.

Plaintiff's design defect theory also fails under the risk-utility test. Plaintiff's proposed solution to the alleged design defect is to incorporate a rebounding hammer into the Handgun. With respect to this theory of liability, Defendant has shown that no such similarly situated firearms exists on the market, the actual patent holder for this technology testified that this safety system had not been implemented into a Derringer of the size at issue in this case, and Cobra's

representative testified that it was not feasible. Thus, the incorporation of such a feature is not feasible.

Further, it is undisputed that every Derringer with a rebounding hammer is larger in size and weight, but that the small size and light weight of the Handgun are its primary attributes. Thus, the implementation of a rebounding hammer would require an increase in the Handgun's size and pricing (which would in turn decrease the Handgun's utility). Plaintiff's experts have stated that creating such a design and maintaining the Handgun's utility would be simple, yet they have not produced any testing data or prototypes to show that such a feat can actually be accomplished. Id. at ¶38. Indeed, Gregory Bond, the firearm designer who installed a rebounding hammer in his larger-sized Derringer line, does not support Plaintiff's expert's opinions. Id. at ¶¶ 15 to 18. Significantly, the Bond rebounding hammer was implemented to avoid a "slam" fire scenario where a cartridge discharges when the barrels are closed, and does not guarantee that a firearm will not discharge when dropped. Id. at ¶ 18. For this reason, the Bond Derringer still uses cross-bolt safety feature, just like the Cobra Derringer, which completely undercuts Plaintiff's design defect theory. Id. at ¶ 16. Mr. Belk himself testified that he would need to test physical prototypes to determine the feasibility of his proposed design, yet he has failed to do so, and testified that he is not qualified to create such a prototype. Id. at ¶38. The complete absence of evidence establishing that the installation of a rebounding hammer would not hinder the Handgun's function, decrease its utility, or cause a significant increase in its price warrants dismissal of Plaintiff's design defect claim under the risk-utility test.

### B. Plaintiff's Manufacturing Defect and Failure to Warn Claims Must be Dismissed for Lack of Supporting Evidence.

To support a manufacturing defect claim, Plaintiff must show that the product fails to perform reasonably and safely in the manner for which it was intended. Shaffer v. Honeywell, Inc., 249 N.W.2d 251, 256 (S.D. 1976); First Premier Bank v. Kolcraft Enters., 686 N.W.2d 430, 445 (S.D. 2004). "The [product] must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Brech v. J.C. Penney Co., 532 F. Supp. 916, 922 (D.S.D. 1982) (quoting Restatement (Second) of Torts, § 401A). In general, a manufacturing defect claim exists when a product it not produced pursuant to the manufacturer's intended design, and that "defect" causes the product to be unreasonably dangerous.

To prevail on a strict liability failure to warn claim, Plaintiff must establish that: (1) a danger existed associated with a foreseeable use of the product; (2) an inadequate warning was given regarding the danger; (3) as a result of the inadequate warning, the product was rendered defective and unreasonably dangerous; (4) the defective and unreasonably dangerous condition existed at the time it left the control of the manufacturer; (5) the product was expected and did reach the user without a substantial unforeseeable change in the condition that it was in when it left the manufacturer's control; and (6) the defective condition was the legal cause of his injuries. Burley v. Kytec Innovative Sports Equip, Inc., 737 N.W.2d 397, 408-09 (S.D. 2007).

Here, Plaintiff has presented no evidence of a manufacturing defect or a deficiency in the Handgun manual's warnings. Plaintiff's liability experts, Jack Belk and Richard Ernest, testified that there were no manufacturing defects that caused or contributed to the accident. See Cobra's

Statement of Undisputed Material Facts, ¶ 35. They also testified that they were not offering any opinions as to the adequacy of the warnings in the Handgun manual. Ibid. The manual provided several instructions that would have prevented the subject incident, including instructions about pointing the gun in a safe direction, not loading the gun until it is ready to be fired, and placing the hammer in the half-cock position with the cross-bolt safety engaged until the Handgun was ready to be fired. Id. at ¶ 13. These facts alone warrant dismissal of any manufacturing defect and failure to warn claims.

Additionally, Plaintiff's decision to ignore the manual for the Handgun and fire it without reviewing the instructions requires dismissal of any strict liability or negligence failure to warn claims. Karst v. Shur-Co., 878 N.W.2d 604, 614 (S.D. 2016) (["C]ourts generally hold that a plaintiff's failure to read a given warning precludes establishment of the causation element even if the warning is arguably inadequate. An issue as to the adequacy of a warning necessarily presupposes that the operator has read the warning. The presence or absence of anything in an unread owner's manual simply cannot proximately cause a plaintiff's damages.").

### C. Plaintiff's Negligence Claims Must be Dismissed.

In order to prevail in a suit based on negligence, a plaintiff must prove a duty, a breach of duty, proximate and factual causation, and an actual injury. Hendrix v. Schulte, 736 N.W.2d 845 (S.D. 2007). In a products liability action based on negligence, the evidence must show that the manufacturer or seller failed to exercise reasonable care to inform those expected to use the product of its condition, or of the facts which make it likely to be dangerous. Jahnig v. Coisman, 283 N.W.2d 557, 560 (S.D. 1979). In applying South Dakota law, the Eighth Circuit has made

clear that if a plaintiff's strict product liability claims fail, his negligence claims necessarily fail as well: "[i]f the product's design did not render it unreasonably dangerous, [the defendant manufacturer] cannot be said to have designed the product negligently. Similarly, [the defendant manufacturer's] failure to warn cannot be negligent where it does not render the product 'unreasonably dangerous' relative to consumer expectations of the time." Robinson v. Brandtjen & Kluge, Inc., 500 F.3d 691, 697 (8th Cir. 2007) (applying South Dakota law).

Plaintiff's negligence claims should be dismissed in conjunction with his strict liability claims because of his misuse of the Handgun. Ibid. Furthermore, Plaintiff has failed to establish that Cobra breached any duty to Plaintiff, nor has he established that any alleged breach of duty proximately caused Plaintiff's injuries. Plaintiff's theory of liability is that the Handgun is defective in design because it "only" has two active safety mechanisms and a third or alternative passive safety should have been implemented. Plaintiff's expert, Jack Belk, proposes that the installation of a rebounding hammer in the Handgun would make it safer (i.e., less likely that that the firearm will discharge when dropped). See Cobra's Statement of Undisputed Material Facts, ¶ 38. Additionally, neither of Plaintiff's experts have created a prototype or tested if a rebounding hammer could be installed in the Handgun and function properly. Ibid. Thus, Plaintiff's experts' attempt to set forth an alternative design for the Handgun but have not provided any supporting data to show that any of their theories are feasible within this design envelope or capable of being manufactured on a large-scale production line.

Lastly, there is no dispute between the parties or their respective experts that the subject incident could not have occurred if Plaintiff had simply followed the clear instructions in the

Handgun's manual and used the half-cock safety, the cross-bolt safety, or preferably both. Id. at ¶34. It is indisputable that Plaintiff's philosophy of ignoring the written warnings for his firearms is the sole proximate cause of the incident. For these reasons, summary judgment in favor of Cobra as to Plaintiff's negligence claims is warranted as well.

### D. Plaintiff's Request for Punitive Damages Must be Denied.

South Dakota's Codified Laws § 21-3-2 provides as follows:

> In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful and wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

For purposes of the statue, actual malice is a positive state of mind, "evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will towards that person." Holmes v. Wegman Oil Co., 492 N.W.2d 107, 112 (S.D. 1992). Presumed malice is malice which the law infers from or imputes to certain acts. Ibid.

In Holmes, the defendant was the manufacturer of a liquified gas heater thermostatic control. Id. at 109. During production and distribution of the control, it became apparent that the knob on the control could become stuck in the pilot position and allow gas to flow. Once defendant became aware of the issue, it introduced iterations of a new knob but failed to warn its prior customers of the knob problem. Defendant began a recall campaign for its prior knob 10 years after it first became aware of the issue, and after 22 explosions and 5 deaths had occurred. Id. at 110. Prior to the recall, the defendant's personnel were instructed to treat any damage claims with the "foregone conclusion that we are not involved." Id. at 109. One day after the

recall campaigns were started, the plaintiff suffered burns over 70% of his body due to an explosion resulting from the defendant's faulty knob. Id. at 111. At trial, the jury awarded $2.5 million in punitive damages. The defendant appealed, arguing that the record was insufficient on the issues of malice and punitive damages. Ibid. On appeal, the Supreme Court of South Dakota found that there was evidence to support a finding of presumed malice because: (1) the defendant waited 10 years to issue a recall despite the occurrence of multiple explosions and deaths; (2) defendant redesigned the fault knob but failed to warn its prior customers about the problem with the knob; and (3) defendant maintained a policy that it was not involved in any claims related to the explosions.

Unlike the plaintiff in *Holmes*, Plaintiff has not presented any evidence of actual or presumed malice by Cobra. There is no evidence that Cobra defrauded anyone, withheld information that led to injury or death, or intended to harm members of the public. To the contrary, Cobra warns its users that failure to follow the instructions in the manual can lead to serious injury or death. See Cobra's Statement of Undisputed Material Facts, ¶ 13. The only reason that Plaintiff was injured in this incident is because he chose not to read the warnings that accompanied his Handgun, which is based on a design that has existed for over a century. Indeed, a purchaser of the Cobra Derringer model firearm need only look at the warning on the cover of the manual to know that the Handgun should be carried with the hammer half-cocked and the cross-bolt safety engaged. Even assuming for purposes of this motion that an additional safety feature in the Handgun could have prevented Plaintiff's injuries, there would still be no act or omission made by Cobra which would rise to the level of intent or malice required to

justify an award for punitive damages. For this reason, summary judgment denying Plaintiff's request for punitive damages is unwarranted.

## CONCLUSION

Based on the foregoing, and the well-established caselaw recounted above, Plaintiffs' lawsuit must be dismissed with prejudice and summary judgment should be entered in favor of Cobra.

Dated this 30th day of November, 2018

/s/ Bill Fuller
Bill Fuller, Esq.
FULLER & WILLIAMSON, LLP
7521 S. Louise Ave
Sioux Falls, S.D. 57108

Jeffrey M. Malsch, Esq.
Anthony M. Pisciotti, Esq.
PISCIOTTI MALSCH
30 Columbia Turnpike – Suite 105
Florham Park, N.J. 07932

*Attorneys for Defendant
Cobra Enterprises of Utah, Inc.*